## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

CHARLTON WOODYARD                          )
1245 Beacon Parkway East                   )
Apartment J                                )
Birmingham, AL 35209                       )
                                           )
            Plaintiff,                     )
                                           )
     v.                                    )
                                           )
ARMSTRONG WILLIAMS                         )
236 E St., NE                              )
Washington, D.C. 20002                     )
                                           )     Case No. 1:16-cv-1443
HOWARD STIRK HOLDINGS II, LLC              )
201 Massachusetts Ave., NE                 )
Suite C-1                                  )
Washington, D.C. 20002                     )
                                           )
            Serve:                         )
                                           )
C T Corporation System                     )
1015 15th St., NW                          )
Suite 1000                                 )
Washington, D.C. 20005                     )
                                           )
            Defendants.                    )
_____)


## COMPLAINT FOR MONETARY RELIEF AND JURY DEMAND

### Preliminary Statement and Introduction

1.      This is a civil action for monetary relief for injuries Plaintiff Charlton Woodyard

sustained as a result of Defendants Armstrong Williams's and Howard Stirk Holdings II, LLC's

("HSH" or "the Company"), sexual harassment and retaliation against him in violation of the

District of Columbia Human Rights Act (DCHRA), D.C. Code Ann. §§ 2-1401.01 et seq.  This is also an action against Defendants for sexual assault and battery; and for failure to pay wages for work performed, in violation of District of Columbia Common Law, the Fair Labor Standards Act, 29 U.S.C. §§ 203 et seq., and the District of Columbia Minimum Wage Act (DCMWA), D.C. Code Ann. § 32-1001 et seq.  This is also an action against Defendants for tortious interference with business expectancy in violation of District of Columbia common law.

2.      Mr. Williams used his star power as a prominent conservative political commentator and radio host to cultivate a relationship with Mr. Woodyard.  Mr. Williams, who is 30 years older than Mr. Woodyard, befriended the then 26-year-old in 2013 and brought him into what Mr. Williams referred to as a "mentor-mentee relationship."  Mr. Williams lured Mr. Woodyard into his orbit with the promise of assistance in realizing his dreams of financial success in either the fashion or media realms.  Mr. Williams convinced Mr. Woodyard to work for him, full-time and for little or no compensation, and rewarded him with introductions to U.S. Supreme Court Justice Clarence Thomas, U.S. Senator Tim Scott, and presidential candidates Donald Trump and Ben Carson.  Mr. Williams served as an advisor to Dr. Carson's presidential campaign, and he made Mr. Woodyard feel like an insider by sharing his views about Dr. Carson's deficiencies as a candidate.  Mr. Williams also took Mr. Woodyard as his guest to the White House Correspondents' Dinner in both 2014 and 2015.  Mr. Williams used this relationship to control Mr. Woodyard financially, professionally, and emotionally, and ultimately abused his power to attempt to exploit him sexually.

3.      Mr. Williams's calculated scheme of creating emotional, financial, and professional dependency deterred Mr. Woodyard from questioning Mr. Williams's escalating pattern of overly familiar and intimate behavior.  Moreover, Mr. Woodyard knew that Mr.

Williams, as a prominent conservative radio host and political commentator, had spoken out against homosexuality and the LGBTQ community.  Mr. Williams also served as a top advisor to then presidential candidate Dr. Carson, who publicly equated homosexuality with bestiality, opposed same-sex marriage, and accused marriage equality advocates of "directly attacking the relationship between God and his people."  For these reasons, Mr. Woodyard did not think Mr. Williams's actions were sexual in nature given his expressed animus towards LGBTQ individuals and his endorsement of Dr. Carson and his anti-gay views.

4.      On November 1, 2015, Mr. Williams subjected Mr. Woodyard to a prolonged and unwelcomed series of sexual advances.  Mr. Woodyard repeatedly rejected Mr. Williams's sexual advances and explicitly told Mr. Williams that he was not interested in having sex with him.  Mr. Williams refused to take no for an answer and told Mr. Woodyard that he was attracted to him.  He then groped Mr. Woodyard's penis and engaged in other unwelcome sexual contact.  When Mr. Woodyard rejected these unwelcomed advances, Mr. Williams offered to pay him for sex.  As Mr. Woodyard had feared he would, Mr. Williams responded to Mr. Woodyard's rejection of his sexual advances by commencing a campaign of retaliation against him, which culminated in his termination from his job with HSH shortly after Mr. Woodyard told his supervisor that he believed Mr. Williams was sabotaging him with HSH because he had rejected Mr. Williams's sexual demands.

### Jurisdiction and Venue

5.      This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), as this matter contains a federal question.  This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a).  This Court also has

jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(a)(1), as the amount in controversy exceeds $75,000 and there is complete diversity of citizenship.

6.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a)(1) and (b)(2), as a substantial number of the events or omissions giving rise to Plaintiff's claims occurred in the District of Columbia.

## Parties

7.    Charlton Woodyard is an adult resident of the State of Alabama.  He was employed by Mr. Williams in the District of Columbia from April 2013, until September 2013. He was employed by Mr. Williams and Howard Stirk Holdings II, LLC in Birmingham, Alabama from November 9, 2015, until April 29, 2016.  At all times relevant to this complaint, Mr. Woodyard was an "employee" within the meaning of the DCHRA, D.C. Code Ann. §§ 2-1401.01 et seq., the FLSA, 29 U.S.C. §§ 203 et seq., and the DCMWA, D.C. Code Ann. §§ 32-1001 et seq.

8.    Defendant Armstrong Williams is an adult resident of the District of Columbia who resides at 236 E St., NE, Washington, D.C. 20002.  Mr. Williams is the sole owner of defendant Howard Stirk Holding II, LLC.  Mr. Williams is an employer within the meaning of the DCHRA, D.C. Code Ann. §§ 2-1401.01 et seq., the FLSA, 29 U.S.C. §§ 203 et seq., and the DCMWA, D.C. Code Ann. §§ 32-1001 et seq.

9.    Defendant HSH is a Delaware Limited Liability Company.  HSH conducts business and maintains an office in the District of Columbia located at 201 Massachusetts Ave., NE, Suite C-1, Washington, D.C. 20002.  HSH is an employer within the meaning of the DCHRA, D.C. Code §§ 2-1401.01 et seq., the FLSA, 29 U.S.C. §§ 203 et seq., and the DCMWA, D.C. Code Ann. §§ 32-1001 et seq.

### Factual Allegations

### Armstrong Williams "Hired" but Never Paid Charlton Woodyard

10.     Charlton Woodyard met Armstrong Williams sometime in early April of 2013. At the time, Mr. Woodyard was working as a sales representative at the Jos. A. Bank store in Union Station in Washington, D.C.  Mr. Williams came into the store and struck up a conversation with Mr. Woodyard.  Mr. Williams told Mr. Woodyard that he was impressed with Mr. Woodyard, and asked him to come to his office the following morning at 6:30 a.m. to explore the possibility of Mr. Woodyard's coming to work for Mr. Williams.

11.     Mr. Woodyard arrived at Mr. Williams's office early the next morning, and the two spent the entire day talking and working together.  Mr. Williams gave Mr. Woodyard various tasks, including administrative work and production assistance assignments on Mr. Williams's SiriusXM radio show that evening.  Mr. Williams invited Mr. Woodyard to co-host that radio show on that first day.  At Mr. Williams's direction, Mr. Woodyard worked at a desk in Mr. Williams's office, and Mr. Williams treated him as his executive assistant in front of others who came to meet with Mr. Williams.

12.     Soon after Mr. Woodyard spent the day at Mr. Williams's office, Mr. Williams enticed Mr. Woodyard to quit his job at Jos. A. Bank by telling him that he saw him as a mentee whom he would groom to be an executive working alongside Mr. Williams at HSH, and eventually running the day-to-day operations of HSH.  Mr. Woodyard continued working for Mr. Williams, without going through any Company orientation or on-boarding process.  Despite the fact that Mr. Woodyard came into the office on a near-daily basis, routinely worked 10 to 12 hour days, and was treated as part of Mr. Williams's core team, Mr. Williams failed to pay Mr. Woodyard for this work.  That unpaid work included radio show co-hosting and production,

marketing coordination for Mr. Williams's companies, and administrative and executive assistant

duties.

13.     Mr. Williams encouraged Mr. Woodyard's career ambitions and assured Mr.

Woodyard that he would be successful if he continued in a close mentoring relationship with

him.  Mr. Williams used his power to gain more and more control over Mr. Woodyard's life,

insisting that Mr. Woodyard do additional work for him at his house at night after the evening

radio show.  Mr. Williams directed Mr. Woodyard to stay at his home until he completed any

tasks Mr. Williams assigned him.  Although Mr. Williams did not put Mr. Woodyard on the

payroll, he paid some of Mr. Woodyard's expenses: Mr. Williams regularly took Mr. Woodyard

out to meals, paid for his dry-cleaning, and paid for Uber rides and other transit around

Washington D.C.  Mr. Williams used this fact, and the introductions he provided to Mr.

Woodyard to his elite social network, to excuse not paying Mr. Woodyard for the work he

performed.

**Mr. Williams Used Social and Recreational Opportunities to Increase
His Control Over Mr. Woodyard**

14.     During this time, Mr. Williams began to take Mr. Woodyard along as his guest to

political and social events in Washington, D.C.  Mr. Woodyard was impressed by this new world

that Mr. Williams opened up to him and took Mr. Williams at his word that he saw talent in Mr.

Woodyard that he would cultivate.  In 2013, Mr. Woodyard met prominent political figures and

media personalities.  For example, in October 2013, Mr. Williams arranged for a private meeting

with Justice Thomas.  At the same time, Mr. Woodyard started to feel uncomfortable with some

of Mr. Williams's behavior.  Mr. Williams frequently told Mr. Woodyard and others that Mr.

Woodyard was "his favorite," and on one such occasion, told Mr. Woodyard that he was Mr.

Williams's favorite because of his physical attractiveness.  Mr. Williams also sometimes hugged

Mr. Woodyard tightly, pressing his penis against Mr. Woodyard's.  This sexual contact was

unwelcome.

15.     Shortly after Mr. Woodyard began working for Mr. Williams, Mr. Williams

began to insist that Mr. Woodyard accompany him three or four times a week for early morning

workouts at  the Results Gym in the Capitol Hill neighborhood of Washington, D.C.  While at

the gym, Mr. Williams pressured Mr. Woodyard to accompany him into the men's steam room

after exercising.  Mr. Woodyard agreed but kept a towel wrapped around himself.  Mr. Williams

generally removed his towel and sat naked, exposing himself to Mr. Woodyard.  Mr. Williams

also made frequent remarks to Mr. Woodyard while naked in the steam room, about Greek and

Roman bath houses.  At the time, Mr. Woodyard found this behavior and the comments to be

inappropriate and too familiar for a professional relationship.  Later, Mr. Woodyard came to

believe that Mr. Williams's nudity and statements referring to homosexual practices in ancient

society were attempts at testing Mr. Woodyard's boundaries.

16.     Mr. Williams frequently invited Mr. Woodyard to his home during the time they

worked together, often so that Mr. Woodyard could continue working on projects for Mr.

Williams after the workday ended.  On many of these occasions, Mr. Williams invited Mr.

Woodyard to sleep in a guest bedroom, sometimes followed by a gym workout the following

morning.  While Mr. Woodyard worked in his home, Mr. Williams often invited Mr. Woodyard

to discuss work-related matters in Mr. Williams's bedroom, while Mr. Williams changed clothes.

One night in the summer of 2013 when Mr. Woodyard stayed overnight in Mr. Williams's guest

bedroom, Mr. Woodyard woke up to the sound of someone trying to open the door to his

bedroom.  Out of habit, Mr. Woodyard had locked the door to the room.  Mr. Williams was the

only other person in the house that night.

17.     Mr. Woodyard believed Mr. Williams's promises that he would help him professionally and knew that if he objected to Mr. Williams's inappropriate behavior he would withdraw all professional support he had offered to provide. Instead, Mr. Woodyard tried to maintain a professional relationship with Mr. Williams and to work hard to impress him with his work ethic.

18.     Around June 2013, Mr. Williams and Mr. Woodyard had a discussion about Mr. Williams investing in Mr. Woodyard's planned clothing company. Mr. Woodyard mentioned his interest in traveling to Italy to learn more about men's fashion. Mr. Williams offered to pay for the two of them to travel to Italy for a week in August 2013 for the ostensible purpose of learning about the fashion industry there. However, at several points during this trip, some of Mr. Williams's behavior made Mr. Woodyard uncomfortable. For example, several times, Mr. Williams picked out restaurants for dinner that had a romantic atmosphere. Mr. Williams frequently hugged Mr. Woodyard while on the trip, and held his hand for a moment while the two visited the Sistine Chapel. Mr. Woodyard attempted to pull away during these moments without making an issue of it. Mr. Williams also made reference to relationships between older and younger men in ancient Greece and Rome, overtly mentioning the homosexual nature of many of those relationships. Given the wide disparity in their ages and Mr. Williams's overly familiar behavior, Mr. Woodyard became increasingly uncomfortable with the tenor of these conversations. Finally, at one stop during their trip, Mr. Woodyard and Mr. Williams checked into a hotel room, only to find that Mr. Williams had reserved a room with a single king-sized bed. Mr. Woodyard insisted that Mr. Williams move them to a room with two beds.

19.     While Mr. Woodyard was concerned about Mr. Williams's intentions towards him, he continued to attribute Mr. Williams's actions to a bizarre attempt to bond with Mr.

8

Woodyard as his mentee.  He had heard Mr. Williams on his radio show and in private make

disparaging and homophobic comments about gay people and the LGBTQ community.  Mr.

Woodyard believed that Mr. Williams's views, and general conservative politics, belied any

possibility that Mr. Williams had any sexual interest in him.

### Mr. Williams Makes Good on Promises of Helping Mr. Woodyard Find Work

20.      In September 2013, Mr. Williams finally helped Mr. Woodyard obtain a paying,

full-time job after requiring him to work for free as his mentee for approximately five months.

Thanks to a connection made by Mr. Williams with John Solomon, the Vice President for

Content and Business Development with the Washington Times, Mr. Woodyard was offered a

position as a Media Booker and Coordinator for the Washington Times shortly before leaving for

Italy in mid-August.  He began his new position in September 2013, and while working at the

Washington Times continued to do occasional unpaid work for Mr. Williams, helping with radio

show production and co-hosting the show one or two times a week.  Mr. Woodyard was

successful in his job, helping the news organization's columnists and other writers increase their

general media presence and improving relationships with other media organizations.  Mr.

Woodyard also helped create a radio platform for the Washington Times, and began discussing

ideas with Mr. Solomon to increase the organization's online presence.  Mr. Solomon and Larry

Beasley, the CEO of the Washington Times praised Mr. Woodyard's work and his

accomplishments in these areas.

21.      While Mr. Solomon was pleased with Mr. Woodyard's work at the Washington

Times, Mr. Williams was displeased that Mr. Woodyard was spending less time with him and

was no longer dependent on him financially.  Mr. Williams expressed his displeasure to Mr.

Woodyard about this.  By September 2014, Mr. Williams decided he no longer approved of Mr.

Woodyard's working for the Washington Times or of the way he spent his time there.  Mr. Williams called Mr. Solomon to discuss Mr. Woodyard's employment while Mr. Woodyard sat in Mr. Williams's office.   Mr. Williams told Mr. Solomon that Mr. Woodyard was not effective in his work at the Washington Times and had been given too much leeway in setting his work schedule – leeway that Mr. Solomon had given Mr. Woodyard because he had confidence in Mr. Woodyard's work.  Mr. Williams did not tell Mr. Solomon that Mr. Woodyard was in the room with him and listening to their call.  This call demonstrated to Mr. Woodyard that Mr. Williams had control over Mr. Woodyard's employment at the Washington Times, and that he would not tolerate the fact that Mr. Woodyard had begun to find success independent of his patronage.

### Mr. Williams Gets Mr. Woodyard Fired from the Washington Times but Promises to Help With a New Venture—Washington Times Live

22.     In November 2014, Mr. Woodyard requested a meeting with Mr. Solomon to receive feedback about his job performance at the Washington Times.  Instead of providing performance feedback, Mr. Solomon told Mr. Woodyard that he would likely be laid off as part of an upcoming reduction in force to make necessary budget cuts.  By this time, Mr. Woodyard had been developing an idea for a new "social news platform" for the Washington Times, which he had named "Washington Times Live."  Mr. Woodyard told Mr. Solomon that he would resign his employment rather than being laid off, and proposed to continue working on his social news platform idea in a partnership between the Washington Times and Avi8ted Thoughts, a company Mr. Woodyard had started.  Mr. Solomon was interested in this idea, and agreed to explore the partnership and development of Washington Times Live.

23.     From the time of his departure from the Washington Times through much of 2015, Mr. Woodyard worked with Mr. Solomon and others at the Washington Times to explore development of Washington Times Live.  Mr. Solomon assigned Joe Corbe, the Washington

Times's Advertising Director, to work with Mr. Woodyard to vet the business and revenue potential of the idea. Mr. Woodyard's proposal for Washington Times Live involved a web-based platform, separate from the Washington Times' main website but affiliated with it, that would allow for news content generated by members of the public and moderated by Washington Times Live staff overseen by Mr. Woodyard. After this initial vetting period, Mr. Woodyard and the Washington Times signed a Memorandum of Understanding (MOU) on April 7, 2015. The MOU lists Mr. Solomon and Mr. Woodyard as contacts for the two partners, and was signed by Mr. Woodyard on behalf of Avi8ted Thoughts and Keith Cooperride, the Washington Times' CFO, on behalf of the Times. This initial MOU expired on July 1, 2015, and the two parties extended it at that time until August 31, 2015. In this agreement, the Washington Times agreed to assist in the development of Washington Times Live by offering resources and suggestions that might add value to the project, including authorization to use the Washington Times name and distribution resources, as well as use of its facilities and equipment, with the intent of developing a formal partnership agreement."

24. According to revenue projections that Mr. Woodyard and Mr. Solomon prepared, Mr. Woodyard anticipated earning approximately $1.3 million in his share of profits for the first year of the platform's operation. Mr. Williams was not officially a part of this partnership but had repeatedly assured Mr. Woodyard that he would assist him with this business venture. Mr. Woodyard sought his assistance on multiple occasions in 2015, asking him to encourage Mr. Solomon and the Washington Times to proceed with plans for the platform. In October 2015, Mr. Solomon told Mr. Woodyard that the Washington Times was ready to officially launch Washington Times Live, and requested that Mr. Woodyard send a licensing agreement to the legal counsel for the Washington Times. On October 19, 2015, Mr. Woodyard did so.

**Mr. Williams Continues to Offer Support and Assistance Without Tangible Results**

25.     Mr. Woodyard had been without a steady income since leaving his position with the Washington Times in November 2014.  As a result, he became wholly financially dependent on Mr. Williams and believed his promises of paid work and assistance in finding career-enhancing employment.  Mr. Williams also continued his practice of including Mr. Woodyard in social and political events.  Mr. Williams took Mr. Woodyard to the annual White House Correspondents' Dinner in April 2015 (Mr. Williams had taken Mr. Woodyard as his guest in 2014 as well, while Mr. Woodyard still worked at the Washington Times).  Mr. Williams had also by this time become an adviser to Dr. Ben Carson's presidential campaign, and Mr. Williams included Mr. Woodyard in meetings with Dr. Carson on several occasions, and in meetings with U.S. Senator Tim Scott.  At times, Mr. Williams treated Mr. Woodyard as a trusted assistant and confidant and flattered him about his acumen and business potential.  Mr. Williams confided in Mr. Woodyard about his concerns with Dr. Carson's candidacy, including calling Dr. Carson "slow" and "naïve" and stating that he believed Dr. Carson lacked business savvy.

26.     Throughout 2015, Mr. Woodyard asked Mr. Williams for work, both in the form of paid projects and for assistance obtaining a full-time job.  Mr. Williams, who was well-aware of Mr. Woodyard's economic situation, occasionally provided Mr. Woodyard with work paid on a project-by-project basis, but did little to assist Mr. Woodyard find full-time employment.  In May 2015, Mr. Woodyard asked for Mr. Williams's assistance in obtaining a position with WJLA, a D.C. television station, and in July 2015, Mr. Woodyard asked whether Mr. Williams could help him get a position with Sinclair Broadcasting Group, using his connection to Sinclair's CEO, David Smith.  On both occasions, Mr. Williams told Mr. Woodyard he might be

able to offer some assistance, but in fact offered no further help and even refused to answer Mr. Woodyard's further entreaties. Mr. Williams did continue to suggest to Mr. Woodyard, as he had since they met in 2013, that there might be a position for Mr. Woodyard in one of Mr. Williams's companies. However, the position for which Mr. Williams had suggested he was "grooming" Mr. Woodyard, running the operations of HSH, had already been filled at this point by Marques Mullings, who Mr. Williams had hired to be the Executive Vice President of HSH. Mr. Williams continued to string Mr. Woodyard along with promises of future assistance.

27. Mr. Williams had essentially replaced Mr. Woodyard as his "mentee" with a friend of Mr. Woodyard's, Xavier Underwood, another young African-American man. Mr. Williams followed the same pattern in fostering a "mentor-mentee" relationship with Mr. Underwood that he used with Mr. Woodyard. Mr. Williams took Mr. Underwood to meet with Justice Thomas, invited him to be his guest at the White House Correspondents' Dinner, and took Mr. Underwood to travel with him to Paris.

28. Mr. Williams continued to exert control over Mr. Woodyard's life. Mr. Williams frequently directed Mr. Woodyard via text message to come to his house or office to discuss matters with little or no warning. Mr. Woodyard, who had previously lived near Mr. Williams's home and office in Washington D.C.'s Capitol Hill neighborhood, now lived with family in Upper Marlboro, Maryland, in part because he could not afford Washington, D.C. rent. Despite having to travel a greater distance to meet with Mr. Williams, Mr. Woodyard made every effort to do so when requested, hoping for another job opportunity. However, if Mr. Woodyard was a few minutes late to these meetings, Mr. Williams canceled them. If Mr. Woodyard protested this or otherwise questioned Mr. Williams's demands of him, Mr. Woodyard would stop responding

to Mr. Woodyard's text messages and generally would punish him by ignoring him for several days.  Fearful of being cut-off altogether, Mr. Woodyard acceded to Mr. Williams's demands.

29.     Throughout the fall of 2015, Mr. Woodyard continued to ask Mr. Williams for assistance in finding employment, and asked Mr. Williams directly for a position with HSH in an October 10, 2015, text message.  Finally, on or around October 29, 2015, Mr. Williams offered Mr. Woodyard a position working for HSH in Las Vegas, Nevada as a Creative Programmer with KVMY-TV, an HSH-owned station there.  This offer gave Mr. Woodyard an opportunity to work in a prominent media market.  Mr. Woodyard orally accepted the job offer, and soon after, HSH sent Mr. Woodyard a letter dated October 30, 2015, confirming this employment arrangement.

### Mr. Woodyard's Rejection of Mr. Williams's Sexual Advances

30.     On November 1, 2015, Mr. Williams directed Mr. Woodyard to come to his office at 7:00 p.m. to discuss the job with HSH and other business opportunities, including Washington Times Live.  After Mr. Woodyard arrived at Mr. Williams's office, he directed Mr. Woodyard to accompany him to his home to continue the discussion.  Shortly after they got to Mr. Williams's house, Mr. Williams called Mr. Mullings to tell him to call Mr. Woodyard about the HSH position.  Mr. Mullings immediately called Mr. Woodyard, not realizing that Mr. Woodyard was with Mr. Williams at the time, and told Mr. Woodyard that he would discuss the details of the new job in the next few days.  Once again, Mr. Williams made clear that he controlled Mr. Woodyard's professional destiny including the job opportunity with HSH in Las Vegas.

31.     By this point, Mr. Williams had gone into his bedroom, and told Mr. Woodyard to join him there to continue their discussion about business matters because he could not hear him from the other room.  Mr. Woodyard walked into Mr. Williams's bedroom, and found him

in the middle of undressing.  Mr. Woodyard stepped back to give Mr. Williams some privacy.

Mr. Williams told Mr. Woodyard not to be uncomfortable and said they had seen each other

nearly nude at the gym many times.  Mr. Williams told him to close and lock the bedroom door.

32.     Throughout the exchange in Mr. Williams's bedroom, Mr. Woodyard repeatedly

tried to steer Mr. Williams into discussion of the business matters he had expected to be the

focus of the meeting, while Mr. Williams escalated his efforts to force Mr. Woodyard to have

sex. Mr. Woodyard asked Mr. Williams to write a letter of intent for Washington Times Live that

Mr. Woodyard could then use to attract other investors, and Mr. Williams responded by saying

"go ahead, manipulate me."  That invitation led to a round of escalating sexual demands from

Mr. Williams in response to Mr. Woodyard's request for help with his business venture or future

employment with HSH.

33.     After Mr. Woodyard entered Mr. Williams's bedroom to discuss business, Mr.

Williams asked Mr. Woodyard: "why are you wearing so many layers?"  When Mr. Woodyard

responded that he was "freezing," Mr. Williams replied that that he's "got the heat" and that his

"heat is better" than clothes for keeping him warm.  Mr. Woodyard ignored the comment, as well

as the grunting noises Mr. Williams was making, and instead tried to talk about ways in which

Mr. Williams could support Washington Times Live.

34.     Mr. Woodyard attempted to change the subject by discussing Mr. Williams's

house, and mentioned that he had never been in the house's basement.  Mr. Williams responded

by saying "I've never been in your basement" – a crude reference to anal sex.  Mr. Woodyard

tried to refocus the conversation on business matters but Mr. Williams was clearly interested

only in forcing himself on Mr. Woodyard sexually.  In response to Mr. Woodyard's expressions

of unease, Mr. Williams told him that he would not "do anything to make a move" and that he

would "be on [his] best behavior tonight."  Mr. Woodyard said all he wanted was for Mr.

Williams to "be there for" him by supporting the business ideas and by assisting him with his

efforts to have Mr. Solomon return the licensing agreement.  Mr. Williams ignored Mr.

Woodyard's requests and pressured Mr. Woodyard sexually asking "how much closer can I get?"

When Mr. Woodyard remained silent, Mr. Williams instructed Mr. Woodyard to give him a back

massage.  Mr. Woodyard tried to decline this demand by saying his hands get tired fast.  Mr.

Williams said "you wouldn't say that if Beyoncé were next to you."

35.     Mr. Woodyard realized that by responding to his requests for help in business

matters with a demand for a massage, Mr. Williams was making it clear that he would provide

that help only if Mr. Woodyard acquiesced to his unwelcome demands and did as Mr. Williams

requested.  Mr. Woodyard gave Mr. Williams a brief shoulder and back massage, hoping that

would placate Mr. Williams.  Mr. Williams said "your hands are terrible" and "is that the best

you can do?"  He then ordered Mr. Woodyard to "massage my butt cheeks."  Mr. Woodyard

backed away and stood up, laughing nervously at this request.  Mr. Williams commented that he

knew Mr. Woodyard's "discomfort zone."  Mr. Williams then insisted that Mr. Woodyard get in

bed with him.  Mr. Woodyard did so but tried to maintain some physical distance.

36.     Mr. Williams asked Mr. Woodyard how much he would need to pay Mr.

Woodyard for him to give Mr. Williams a "good" massage.  Mr. Woodyard responded that there

no price and tried yet again to steer the conversation back to business.  Mr. Williams instead

talked about how Mr. Woodyard "would get so hard" when the two of them hugged in the past.

Mr. Williams ordered Mr. Woodyard to put his arms around him, promising he was not "gonna

bite."  Mr. Williams told Mr. Woodyard that he was attracted to him, and insisted that the

attraction was mutual.  Mr. Williams said that Mr. Woodyard was uncomfortable about his own

attraction to Mr. Williams, and when Mr. Woodyard said his attraction to Mr. Williams was only "in spirit," Mr. Williams stated "I'm attracted to you, that's just a fact."  Mr. Woodyard tried to make clear that he did not want to engage in a sexual encounter with him.  Mr. Williams responded that he is not as bad as some think, and that he is "not a user, maybe an abuser, not a user."  Around this time, as Mr. Williams made his sexual intentions explicit, Mr. Woodyard realized that he could not leave the house unless Mr. Williams allowed him to do so by unlocking the front door, which Mr. Williams had locked from the inside.  Mr. Woodyard tried to hide his fear so as to not anger Mr. Williams.  When Mr. Woodyard again tried to discuss business and how Mr. Williams might approach Mr. Solomon, Mr. Williams accused him of manipulating him, put his arms around Mr. Woodyard, and tried to force him to lie on top of him with Mr. Williams's penis pressed against his.  For several minutes Mr. Williams asked Mr. Woodyard if he were bothered by what was happening, and Mr. Woodyard answered unequivocally that Mr. Williams's sexual contact "definitely bothered" him.

37.     Undeterred, Mr. Williams grabbed Mr. Woodyard's penis through his pants and said to him, "you got small feet, small hands… and an oversized weapon.  How does that work?  How is that possible?"  Mr. Woodyard pushed Mr. Williams's hand away and again trying to divert the conversation to business matters.  Mr. Williams ordered Mr. Woodyard to stop talking.  Mr. Williams continued to moan and demonstrate his sexual arousal while making comments about how hard Mr. Woodyard's penis was.  Mr. Williams persisted with his unwelcome sexual advances, to which Mr. Woodyard responded that he was not interested in Mr. Williams sexually.  When Mr. Woodyard made clear, once again, that he did not like Mr. Williams touching his penis, Mr. Williams rolled over on his side, scrolled messages on his cellphone and completely ignored Mr. Woodyard.

38.     In order to extricate himself from this situation, Mr. Woodyard told Mr. Williams that he was late to a planned dinner with his family.  Mr. Williams got up from his bed and walked with Mr. Woodyard to the front door.  Before letting Mr. Woodyard out of his home, Mr. Williams asked Mr. Woodyard how much he would have to pay for Mr. Woodyard to accept his sexual propositions.  Mr. Woodyard rejected this crude proposition and repeated his request that Mr. Williams unlock the door and allow him to leave.  Mr. Williams was visibly angry but allowed Mr. Woodyard to leave the house.

**Mr. Williams's Retaliation against Mr. Woodyard was Immediate**

39.     Mr. Woodyard was shaken and humiliated by Mr. Williams's unwelcome sexual advances and sexual assault.  Although he now knew Mr. Williams's sexual intentions towards him, he felt he had no choice but to continue interacting with Mr. Williams because he had become so financially dependent on him.  Mr. Woodyard hoped that his new position with HSH in Las Vegas, along with the launch of Washington Times Live, would provide him the means to avoid Mr. Williams and to become financially independent.  Over the course of the next month, Mr. Williams derailed those plans.

40.     On November 3, 2016, Mr. Williams and Mr. Mullings told Mr. Woodyard, without explanation, that if he wanted to work for the Company, Mr. Woodyard would have to accept a position working in Birmingham, Alabama with HSH-owned television stations in that region.  Mr. Mullings acknowledged that this location was a change in plans from what they had previously agreed upon and told Mr. Woodyard that he could take a few days to consider the offer.  However, when Mr. Mullings and Mr. Woodyard attended that day's staff meeting with Mr. Williams and his other employees, Mr. Williams forced Mr. Woodyard to make a decision on the spot, in front of everyone.  Mr. Woodyard, faced with the prospect of continued

unemployment and feeling pressured by the setting, accepted the position in Birmingham.  He

visited Birmingham later that month, then moved down on November 30, 2015, to officially

begin his new job with HSH the next day.

41.    Around the time Mr. Woodyard moved to Birmingham, he hoped to execute the

licensing agreement with the Washington Times and launch Washington Times Live.  A few

days after Mr. Woodyard started his job, he drove back to Washington, D.C. to meet with Mr.

Solomon and others from the Washington Times, including Adam VerCammen, the Advertising

& Sales Director.  Mr. Woodyard believed that Mr. Solomon was ready to sign the Washington

Times Live licensing agreement.  At this meeting, Mr. Solomon changed his position on the

partnership, telling Mr. Woodyard that the Washington Times was not ready to sign a licensing

agreement.  Mr. Solomon said that he believed Mr. Woodyard was not ready to uphold his end of

the partnership.  Mr. Woodyard argued that he had done everything they had agreed to in the

MOU, including securing a sponsorship commitment and developing concrete business plans.

Mr. Solomon refused to change his position or offer any further explanation.  Upon information

and belief, Mr. Williams poisoned the waters for Mr. Woodyard and interfered with this business

relationship in retaliation for Mr. Woodyard's rejection of his sexual advances.

42.    On December 7, 2015, Mr. Woodyard learned that Mr. Solomon had resigned his

position with the Washington Times to become the Chief Creative Officer of Circa, a mobile

news startup that the Sinclair Broadcast Group had recently purchased.  Mr. Woodyard was

suspicious about this development, because of its close timing to his meeting with Mr. Solomon

in which he appeared to put an end to the possibility of Washington Times Live.  Mr.

Woodyard's fears were confirmed by the description of Circa in a press release from Sinclair, in

which Mr. Solomon described the news startup as aimed at "engaging the next generation of

news readers who value raw content, differing perspectives, and personalization." *See Sinclair Launches "Circa"; Hires John Solomon As Chief Creative Officer*, PR Newswire (Dec. 7, 2015), http://www.prnewswire.com/news-releases/sinclair-launces-circa-hires-john-solomon-as-chief-creative-officer-300188628.html.  As Mr. Woodyard read the Circa press release, he realized that he had proposed these same concepts to Mr. Solomon throughout their partnership discussions and the similarities with Washington Times Live were unmistakable, including: the target audience (young people), the interface and platform (a customizable mobile app), and the focus on user generated "raw content."  The press release and Mr. Solomon's statements in describing Circa's launch used some of the precise language that Mr. Woodyard had drafted to describe the concept to Mr. Solomon.

43.     Mr. Woodyard also suspected that Mr. Williams was involved in the selection of Mr. Solomon for his new role with Circa, based on Mr. Williams's friendship with the CEO of Sinclair.  In a text message conversation on December 18, 2015, Mr. Woodyard told Mr. Williams that he feared Mr. Solomon would use Mr. Woodyard's ideas in developing Circa.  Mr. Williams responded that Mr. Solomon was hired at his (Mr. Williams's) recommendation, and even referred to the venture as the "SBG [Sinclair Broadcast Group]/HSH Team."  Mr. Woodyard replied with a description of the same ideas he had discussed for Washington Times Live, and Mr. Williams said "You are describing what Circa is and what we are embarking upon."  Unlike the arrangement for Washington Times Live, however, Mr. Woodyard had no economic stake in Circa and would earn no money if it succeeded.

44.     Faced with the loss of his work on, and partnership interest in, Washington Times Live and the need to adapt to life in a new city, Mr. Woodyard focused on being effective in his new role with HSH in Birmingham.  In mid-November, Mr. Mullings had provided Mr.

Woodyard with a description of Mr. Woodyard's duties in his new job in Birmingham.  Mr.

Mullings tasked Mr. Woodyard with engaging other media outlets in order to collaborate on

content and otherwise promote HSH's name and brand.  Mr. Woodyard was also in charge of

developing connections with colleges and universities to create an HSH internship program, and

otherwise help the Birmingham stations develop effective social media campaigns.  Mr.

Woodyard was also tasked with helping with production goals for the stations, and Mr. Mullings

gave him latitude to develop other "unique initiatives" to further build value for HSH and the

local stations.

45.     Based on this document and discussions with Mr. Mullings and his direct

supervisor Amanda Hawkins, the Birmingham-area Station Coordinator, Mr. Woodyard worked

to foster new partnerships for the HSH stations around Birmingham, and met with potential

partners to explore third-party on-air content possibilities.  He worked to establish the necessary

contacts for the HSH internship program, and worked with the Birmingham-area stations, as well

as other HSH-owned stations nationwide, to improve their social media presence and develop

social media campaigns.  For the first few months on the job, Mr. Woodyard provided regular

updates to Mr. Mullings on his work and accomplishments, and Mr. Mullings did not express

any concerns about Mr. Woodyard's performance.

46.     Starting around early February 2016, Mr. Mullings and Mr. Williams stopped

responding directly to Mr. Woodyard's emails about work-related matters, and started

communicating with Mr. Woodyard only through his supervisor, Ms. Hawkins.  Then, on

February 24, 2016, Mr. Williams demoted Mr. Woodyard to being a videographer for the

Birmingham-area stations.  Mr. Williams informed Mr. Woodyard of this in a meeting that Ms.

Hawkins and Mr. Underwood, the HSH Creative Director, and Mr. Williams's new assistant and

mentee, also attended.  Mr. Underwood was a paid employee and companion, in contrast to Mr. Woodyard's status when he served as Mr. Williams's mentee.

47.     Mr. Williams spent most of the meeting speaking only to Ms. Hawkins and deliberately ignoring Mr. Woodyard.  When Mr. Woodyard tried to speak, Mr. Williams cut him off and in a demeaning manner asserted "I am only talking to Amanda."  Mr. Williams offered no explanation for his decision to reduce Mr. Woodyard's duties, but acknowledged that doing videography would mean doing work with which Mr. Woodyard had no training or experience. Mr. Williams gave Mr. Woodyard contact information for a Sinclair cameraman to help Mr. Woodyard learn the skills required for the new work.  However, when Mr. Woodyard followed up the next day by email with Mr. Mullings, Mr. Williams, and Mr. Underwood about making arrangements for the purchase of videography equipment and learning relevant editing software, they failed to respond.

48.     Over the following weeks, Mr. Woodyard sent numerous emails to Mr. Mullings and Mr. Williams following up on his requests for information and support, and these messages were ignored.  He continued to perform other tasks that he had worked on and discussed with Mr. Mullings before the February 24, 2016, meeting, helping to increase HSH's presence on social media and elsewhere online.  He provided regular updates to Mr. Mullings and received no direct response.  On a few occasions, Mr. Mullings responded to Mr. Woodyard by sending a message to Ms. Hawkins, and asking her to pass along his message.  Those communications indicated that Mr. Mullings was generally dismissive of Mr. Woodyard's concerns.

49.     On March 15, 2016, Ms. Hawkins told Mr. Woodyard that Mr. Mullings had called her to tell her that he was placing Mr. Woodyard on a 30-day probationary period, and had offered no explanation for this decision.  This action confirmed Mr. Woodyard's fear that Mr.

Mullings and Mr. Williams had been setting him up for failure at HSH.  Nevertheless, Mr. Woodyard focused on doing what work he could to develop content and work with Ms. Hawkins on overseeing the operations of the Birmingham stations.

50.     On April 15, 2016, Mr. Mullings called Mr. Woodyard and told him that he needed to "soul search" and decide if he was the proper fit for his position at HSH.  Mr. Mullings told Mr. Woodyard that the Company was considering terminating his employment on July 1, 2016, and expressed concerns about Mr. Woodyard's job performance.  Mr. Woodyard told Mr. Mullings that he wished to continue working for HSH.  Mr. Woodyard said that he believed that his demotion and probation, and even the change in the job itself from Las Vegas to Birmingham, stemmed from Mr. Williams's retaliation against Mr. Woodyard for refusing his sexual advances.  Mr. Woodyard was still humiliated over Mr. Williams's actions on November 1, 2015, and while he did not go into detail with Mr. Mullings about the assault, told him expressly that Mr. Williams "came on to me hard and told me to massage his butt cheeks."  Mr. Mullings simply laughed.  Mr. Mullings ended the call by telling Mr. Woodyard that he needed to "evaluate" whether he should remain with HSH.

51.     On April 18, 2016, Mr. Woodyard followed up on that previous phone call with an email to Mr. Mullings, Mr. Williams, Ms. Hawkins, and Mr. Underwood reiterating his desire to continue working for HSH.  He refuted, point-by-point, the issues that Mr. Mullings had raised in the April 15, 2016, phone call, listing his accomplishments with HSH, and reiterating his frustration with the lack of support he had been receiving.  He stated that he hoped they could avoid termination and wanted to explore ways in which he could stay employed with HSH and provide value to the Company.  No one responded to Mr. Woodyard's email.

52.     On April 29, 2016, Mr. Mullings called Mr. Woodyard and told him that HSH was officially terminating his employment.  Mr. Mullings offered no specific reason at that time for the decision which came two weeks after Mr. Woodyard put him on notice that Mr. Williams had sexual harassed him and had taken retaliatory action against him in response to his rejection of Mr. Williams's sexual advances.  Mr. Mullings told Mr. Woodyard that HSH would be sending him termination paperwork, including a severance agreement.  Mr. Woodyard received a severance agreement and release from the Company a few days later, which he initially signed and returned on May 4 given his financial condition.  However, on May 5, 2016, Mr. Woodyard wrote to HSH and revoked the agreement, as allowed by a seven-day revocation period in the agreement.

53.     Mr. Williams's retaliation against Mr. Woodyard has left him stranded in a city where he knows almost no one.  He signed a one-year apartment lease that he cannot afford to break, and he now has no job and few employment prospects.  Mr. Williams's earlier emotional and psychological abuse, culminating with his sexually predatory behavior on the night of November 1, 2015, have left Mr. Woodyard scarred and suffering from depression.

## COUNT I

**DISCRIMINATION ON THE BASIS OF SEX – HOSTILE WORK ENVIRONMENT IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT, D.C. CODE ANN. § 2-1401.01 ET SEQ. AGAINST DEFENDANTS HSH AND ARMSTRONG WILLIAMS**

54.     Paragraphs 1-53 above are hereby incorporated by reference as if set forth fully herein.

55.     The District of Columbia Human Rights Act ("DCHRA") prohibits discrimination on the basis of sex in the enjoyment of all benefits, privileges, terms, and conditions of employment.

24

56.     At all times relevant to this Complaint HSH was an "employer" within the meaning of the DCHRA.

57.     At all times relevant to this Count Plaintiff was an "employee" within the meaning of the DCHRA.

58.     Mr. Williams altered the conditions of Mr. Woodyard's employment and created a sexually hostile work environment, in violation of the DCHRA.  Mr. Williams subjected Mr. Woodyard to unwelcomed sexual advances, sexually explicit remarks, unwanted touching of Mr. Woodyard's penis, and numerous attempts to coerce or force sexual contact.  This conduct was humiliating and physically threatening to Mr. Woodyard.

59.     HSH is liable for Mr. Williams's actions because he was, at all times relevant to this Complaint, the sole owner of the Company.

60.     Defendants' actions have directly and proximately caused Mr. Woodyard substantial economic loss and damage to his career and professional reputation, humiliation, and pain and suffering.

61.     Defendants' actions were wanton, reckless or in willful disregard of Mr. Woodyard's legal rights.


**COUNT II**

**DISCRIMINATION ON THE BASIS OF SEX – QUID PRO QUO SEXUAL HARASSMENT IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT, D.C. CODE ANN. § 2-1401.01 ET SEQ. AGAINST DEFENDANTS HSH AND ARMSTRONG WILLIAMS**

62.     Paragraphs 1-61 above are hereby incorporated by reference, as if set forth fully herein.

63.     The DCHRA prohibits quid pro quo sexual harassment, which takes place when an employer requires, explicitly or implicitly, an employee to engage in sexual acts in order to receive some employment benefit, or face adverse action for refusal to do so.

64.     Mr. Williams engaged in quid pro quo sexual harassment on November 1, 2015, when he requested that Mr. Woodyard engage in sexual acts, including intimate massages and other touching, in response to Mr. Woodyard's discussion of business matters and his employment with HSH.  Mr. Williams implicitly conditioned his support of Mr. Woodyard on Mr. Woodyard's acceptance of his sexual advances.  Mr. Williams later explicitly conditioned this support by asking Mr. Woodyard about "his price" for accepting Mr. Williams's sexual advances.

65.     Mr. Williams retaliated against Mr. Woodyard, as set forth below, for his refusal to accept Mr. Williams's sexual advances and requests.

66.     HSH is liable for Mr. Williams's actions because he was, at all times relevant to this Complaint, the sole owner of the Company.

67.     Defendants' actions were wanton, reckless or in willful disregard of Mr. Woodyard's legal rights.

## COUNT III

### RETALIATION IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT, D.C. CODE ANN. § 2-1401.01 ET SEQ. AGAINST DEFENDANTS ARMSTRONG WILLIAMS AND HSH

68.     Paragraphs 1-67 above are hereby incorporated by reference as if set forth fully herein.

69.     The DCHRA prohibits retaliation against any employee for engaging in opposition to what he reasonably in good-faith believes constitutes unlawful discrimination

under the DCHRA, including the rejection of sexual advances and other forms of sexual harassment.

70.     Mr. Woodyard engaged in protected activity by opposing treatment he reasonably believed constituted unlawful discrimination, including repeatedly rejecting Mr. Williams's unwelcome sexual advances, and reporting Mr. Williams's behavior to Mr. Mullings, the Executive Vice President of HSH.

71.     Defendants HSH and Mr. Williams took adverse action against Mr. Woodyard, including, inter alia, immediately changing Mr. Woodyard's place of employment from a location in Las Vegas, Nevada, to Birmingham, Alabama; taking away Mr. Woodyard's responsibilities and demoting him to a videographer position; placing Mr. Woodyard on employment probation, and terminating Mr. Woodyard's employment.

72.     Defendants' retaliatory actions were causally connected to Mr. Woodyard's protected activity.

73.     At all times relevant to this charge, Mr. Williams used his position as the owner of HSH and to retaliate against him.

74.     Mr. Williams aided, abetted, compelled and coerced the retaliation complained of herein, in violation of the DCHRA.

75.     Defendants' actions have directly and proximately caused Mr. Woodyard substantial economic loss and damage to his career and professional reputation, humiliation and pain and suffering.

76.     Defendants' actions were wanton, reckless or in willful indifference to Mr. Woodyard's legal rights.

## COUNT IV

### ASSAULT AGAINST DEFENDANTS
### ARMSTRONG WILLIAMS AND HSH

77.     Paragraphs 1-76 above are hereby incorporated by reference as if set forth fully herein.

78.     D.C. common law prohibits as an assault any act intended to cause a harmful or offensive contact with another person, or the imminent apprehension of such contact, which puts the other party in such imminent apprehension.

79.     Mr. Williams committed assault against Mr. Woodyard on November 1, 2015, when he repeatedly asked Mr. Woodyard to lie down with him, perform intimate massages, and agree to have sex in exchange for payment.  These statements constituted overt conduct which he took to enable him to accomplish the harmful and offensive purpose of touching Mr. Woodyard's penis, and which had the effect of placing Mr. Woodyard in imminent apprehension of such contact and other physical harm for refusing Mr. Williams's sexual advances.

80.     Mr. Williams committed his assault against Mr. Woodyard in the course of performing his duties as HSH's owner.  Immediately prior to Mr. Williams's assault on November 1, 2015, Mr. Williams and Mr. Woodyard met at Mr. Williams's HSH office to discuss Mr. Woodyard's employment with HSH and other business matters.  Mr. Williams directed Mr. Woodyard to continue their meeting at Mr. Williams's home, and Mr. Williams committed assault as Mr. Woodyard continued to discuss employment related matters.  Mr. Williams's exercise of authority supplied the ostensible reason for Mr. Woodyard came to his home.

81.     Mr. Williams's actions, for which HSH is responsible, directly and proximately have caused, and will continue to cause Mr. Woodyard to suffer loss of income and other

28

financial benefits, a loss of future professional opportunities and future income, pain and

suffering, humiliation, indignity, personal embarrassment, and damage to his professional

reputation.

## COUNT V

### BATTERY AGAINST DEFENDANTS
### ARMSTRONG WILLIAMS AND HSH

82.     Paragraphs 1-81 above are hereby incorporated by reference as if set forth fully

herein.

83.     District of Columbia common law prohibits as battery an unwanted touching of an

individual which is neither consented to, excused, nor justified.

84.     Mr. Williams committed battery against Mr. Woodyard on November 1, 2015,

when he intentionally and repeatedly put his arms around Mr. Woodyard, touched Mr.

Woodyard's penis, and attempted to lie on top of Mr. Woodyard so that their penises would

touch.  Mr. Woodyard expressed discomfort and opposition to Mr. Williams's actions, and Mr.

Williams continued touching Mr. Woodyard.

85.     Mr. Woodyard did not consent to this sexual touching and Mr. Williams can offer

no legitimate excuse or justification for this battery.

86.     Mr. Williams committed his battery against Mr. Woodyard in the course of

performing his duties as HSH's owner.  Immediately prior to Mr. Williams's battery on

November 1, 2015, Mr. Williams and Mr. Woodyard met at Mr. Williams's HSH office to

discuss Mr. Woodyard's employment with HSH and other business matters.  Mr. Williams

invited Mr. Woodyard to continue their meeting at Mr. Williams's home, and Mr. Williams

committed battery as Mr. Woodyard continued to discuss matters related to his employment.

Mr. Williams's exercise of authority supplied the ostensible reason for which Mr. Woodyard came to his home.

87.     Mr. Williams's actions, for which HSH is responsible, directly and proximately have caused, and continue to cause, Mr. Woodyard to suffer loss of income and other financial benefits, a loss of future professional opportunities and future income, pain and suffering, humiliation, indignity, personal embarrassment, and damage to his professional reputation.

### COUNT VI

### TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY AGAINST DEFENDANT ARMSTRONG WILLIAMS

88.     Paragraphs 1-87 above are hereby incorporated by reference as if set forth fully herein.

89.     Under District of Columbia common law, a party is liable for the tort of tortious interference with business expectancy when that party knows of a valid business expectancy and intentionally interferes to cause the termination of that expectancy, and damages result from that termination.  A valid business expectancy means one that is probable, and not merely possible.

90.     Mr. Woodyard had a valid business expectancy in his expected revenue share of the Washington Times Live venture, his planned partnership with the Washington Times, based on the April 2015 Memorandum of Understanding between Mr. Woodyard and the Washington Times, and based on the business plan and revenue projections that the two sides had developed together.

91.     Mr. Williams had full knowledge of Mr. Woodyard's business expectancy from Washington Times Live.

92.     Mr. Williams induced Mr. Solomon, the then-Vice President for Content and Business Development at the Washington Times, to renege on his plans with Mr. Woodyard and

refuse to sign the licensing agreement that would have launched Washington Times Live.  Mr. Williams, along with Sinclair Broadcast Group, then purchased Circa, hired Mr. Solomon, and used Mr. Woodyard's ideas for Washington Times Live to launch a similar media platform, in which Mr. Woodyard has no economic stake.

93.     As a direct and proximate result of Mr. Williams's tortious interference with Mr. Woodyard's business expectancy in Washington Times Live, has suffered significant economic damages equivalent to his probable and significant share in expected Washington Times Live revenue.

## COUNT VII

### VIOLATION OF THE FAIR LABOR STANDARDS ACT, 29 U.S.C. § 207 ET SEQ. AGAINST DEFENDANT ARMSTRONG WILLIAMS

94.     Paragraphs 1-93 above are hereby incorporated by reference as if set forth fully herein.

95.     The Fair Labor Standards Act ("FLSA") requires an employer to pay covered employees at least the statutorily set minimum wage for work performed.

96.     At all relevant times, Mr. Williams was an "employer" engaged in interstate commerce within the meaning of the FLSA.

97.     At all times relevant, Mr. Woodyard was a "covered employee" within the meaning of the FLSA, and was therefore entitled to the protections of the FLSA, including the right to be paid wages for the work he performed.

98.     From April 2013 until September 2013, Mr. Williams required Mr. Woodyard to work at Mr. Williams's office for more than 30-40 hours per week, every week, performing tasks that benefited Mr. Williams's businesses, and Mr. Williams maintained the right to control Mr.

Woodyard's work assignments and the manner in which Mr. Woodyard completed those assignments. Mr. Williams did not compensate Mr. Woodyard for this work, in violation of the FLSA.

99. As a direct and proximate result of Mr. Williams's willful violation of FLSA, Mr. Woodyard has suffered economic loss and is entitled to an award of unpaid wages, liquidated damages and other equitable relief.

## COUNT VIII

### VIOLATION OF THE DISTRICT OF COLUMBIA MINIMUM WAGE ACT, D.C. CODE ANN. §§ 32-1001 ET SEQ. AGAINST DEFENDANT ARMSTRONG WILLIAMS

100. Paragraphs 1-99 above are hereby incorporated by reference as if set forth fully herein.

101. The District of Columbia Minimum Wage Act ("DCMWA") requires an employer to pay covered employees at least the statutorily set minimum wage for work performed.

102. At all relevant times, Mr. Williams was an "employer" within the meaning of the DCMWA.

103. At all times relevant, Mr. Woodyard was a "covered employee" within the meaning of the DCMWA, and was therefore entitled to the protections of the DCMWA, including the right to be paid wages for the work he performed.

104. From April 2013 until September 2013, Mr. Williams required Mr. Woodyard to work at Mr. Williams's office for more than 30-40 hours per week, every week, performing tasks that benefited Mr. Williams's businesses, Mr. Williams maintained the right to control Mr. Woodyard's work assignments and the manner in which Mr. Woodyard completed those

assignments.  Mr. Williams did not compensate Mr. Woodyard for this work, in violation of the DCMWA.

105.    As a direct and proximate result of Mr. Williams's willful violation of the DCMWA, Mr. Woodyard has suffered economic loss and is entitled to an award of unpaid wages, liquidated damages and other equitable relief.

### Requested Relief

WHEREFORE, Plaintiff demands a trial by jury and prays this Court for the following relief:

106.    Enter a judgment in Mr. Woodyard's favor and against Mr. Williams and HSH for violations of the DCHRA, the FLSA, the DCMWA, and District of Columbia common law;

107.    Award Mr. Woodyard compensatory damages in an amount to be proven at trial for the economic and emotional harm that he has experienced as a result of HSH's and Mr. Williams's unlawful conduct;

108.    Award Mr. Woodyard punitive damages in an amount to be proven at trial for the economic and emotional harm that he has experienced as a result of HSH's and Mr. Williams's unlawful conduct;

109.    Award Mr. Woodyard's reasonable attorneys' fees, litigation expenses, and costs; and

110.    Grant such other and further relief as the Court may deem appropriate.

## **Jury Demand**

111.    Mr. Woodyard, through counsel, requests a jury trial on all issues.

Respectfully submitted,

Debra S. Katz (Bar No. 411861)
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W.
Sixth Floor
Washington, D.C.  20009
Telephone: (202) 299-1140
Facsimile: (202) 299-1148
katz@kmblegal.com

*Attorney for Plaintiff Charlton Woodyard*

Dated:   July 13, 2016